# EXHIBIT 8



450 Lexington Avenue
New York, NY 10017
212.850.2800 Phone
212.850.2929 Fax
andrewskurth.com

Arthur D. Felsenfeld
212.850.2823 Phone
afelsenfeld@andrewskurth.com

October 27, 2006

**VIA E-MAIL**

| | |
|---|---|
| John F. Byrne, Esq. | John R. Holsinger, LLC |
| 240 Windsor Place | Two University Plaza, Suite 300 |
| Brooklyn, New York 11215 | Hackensack, NJ 07601 |

Peter M. Collins, Esq.
Hollyer Brady Barrett & Hines LLP
551 Fifth Avenue, 27th Floor
New York, New York 10176

   Re: *13 148 Y 00711 06*
     *Brooks, Houghton & Company, Inc. and Life Partners Holdings, Inc.*

Dear Messrs. Byrne, Collins, and Holsinger:

  This post-hearing submission is being made on behalf of respondent, Life Partners Holdings, Inc. ("Life Partners") to highlight for the Panel evidence supportive of its defenses in this proceeding.

**<u>No Funds Were Provided to Life Partners As A Result Of The Mammoth Transaction</u>**

  As the Panel is aware, it is the position of Life Partners that because no funds were received by Life Partners as a result of the Mammoth Transaction, Brooks, Houghton & Company, Inc. ("Brooks Houghton") was not entitled to a fee under the terms of the March 31, 2004 Letter Agreement (the "Letter Agreement") (Respondent's Pre-Hearing Brief, pp. 10-11).[1] This fact is dispositive of Brooks Houghton's claim in this case. That the Mammoth Transaction Agreements were terminated without Life Partners having received any funds whatsoever was established by, among other evidence, the

---

[1] Under the terms of the Letter Agreement, Brooks Houghton's fee, if any, was to be based on a percentage of the "total value of the placement" which was defined under the Letter Agreement to mean "the total facility amount received by the Company from the facility provider in such Financing" (Letter Agreement, Claimant's Ex. 1, p. 2; Respondent's Pre-Hearing Brief, p. 3)

testimony of Brian Pardo and Scott Peden, by Respondent's Ex. 2 and 3 (establishing that the initial capital contributions to the partnership and into escrow were reduced to zero by agreement of the parties), by Respondent's Ex. 1 (Mutual Termination Agreement establishing that the Agreements were terminated effective August 13, 2006 without any life policies having even been purchased) and was undisputed by Brooks Houghton. Indeed, Claimant's expert, Jonathan Berger, expressly conceded that fact based on his review of the documents.[2] In light of the foregoing, Life Partners respectfully submits that is unnecessary for the Panel to reach any other issue in this case. Nevertheless, we address the evidence supporting Life Partners additional defenses below.

### The Letter Agreement was Terminated

Life Partners refers the Panel to its Pre-Hearing Brief, pp. 4-5, 9-10. The evidence at the hearing established the following:

- Kevin Centofanti testified that, based on his communications with Mike Beste, he ceased doing work for Life Partners following the Sumitomo meeting in November 2004 and did not begin work again until the summer of 2005.

- On August 25, 2005, Mr. Centofanti sent a revised engagement letter dated August 29, 2005 ("Revised Letter Agreement") to Mr. Beste (Claimant's Ex. 21).

- Mr. Centofanti testified that the Revised Letter Agreement was Brooks Houghton's idea and was sent to make sure they would get paid.

- In his August 25, 2005 email transmitting the Revised Letter Agreement, Mr. Centofanti writes: "Please turn this around…so we can sign off on the [Revised] Engagement Letter and being contacting additional investors/lenders (Claimant's Ex. 21).

- Mr. Centofanti testified that he believed that he did not have to contact any new lenders unless the Revised Letter Agreement was signed.

- On October 4, 2005, Mr. Centofanti again wrote via email to Mr. Beste and stated: "We should reach agreement on [the Revised] Engagement Letter before proceeding any further with prospective lenders." He goes on to state: "After we sign the revised Engagement Letter, we would like to offer

---

[2] Mr. Berger also acknowledged that, the general partner of the partnership, a Fortress/Mammoth entity, completely controlled the "purse strings" without Life Partners having the ability to limit the general partner's control in any way.

- you our plan as to how to proceed with Sumitomo's offer..." (Respondent's Ex. 4)

- Mr. Centofanti testified that he was unwilling to share his plan as to how to proceed until the Revised Letter Agreement was signed.

- The Revised Letter Agreement was never signed.[3]

- Mr. Centofanti testified that he did no further work for Life Partners after October 4, 2005.[4] Nor is there any evidence that anyone else at Brooks Houghton did any further work for Life Partners after that date and Mr. Peden specifically testified that they did not.

In light of the fact that Brooks Houghton refused to do any further work and, in fact, did no further for Life Partners after October 4, 2005, the contention that Life Partners was nevertheless bound to deal only through Brooks Houghton even with new investors/lenders is baseless and irrational.

**Life Partners Was Not Required to Refer the Mammoth Transaction to Brooks Houghton**

Life Partners refers the Panel to pages 2-3 and 8-9 of its Pre-Hearing Brief demonstrating that the Mammoth Transaction did not constitute "Financing" as defined by the Letter Agreement. Furthermore, as discussed above, well prior to the time the Mammoth Transaction was entered into on December 31, 2005 (See, e.g. Claimant's Ex. 45-48), Brooks Houghton had communicated that it did not intend to do any further work for Life Partners under the Letter Agreement.

In addition, the language of the Letter Agreement is clear that Brooks Houghton was engaged "on a non-exclusive basis." (Claimant's Ex. 1). Brooks Houghton's argument that the engagement "is only non-exclusive as to the companies listed on a schedule provided by Life Partners" (Claimant's Pre-Hearing Memorandum, p. 4) is contrary to the plain language of the document and is frivolous. The document says what it says and, as Mr. Centofanti testified, he never saw any such schedule, nor is any such schedule referred to anywhere in the Letter Agreement. Moreover, even assuming that there were an ambiguity in the document, it should be construed against the drafter (See, Respondent's Pre-hearing Brief, pp. 8-9). The evidence that the Letter Agreement was drafted solely by Brooks Houghton was undisputed.

---

[3] Mr. Peden testified that given the lack of success based on the original Engagement Letter, he had no interest in signing a new one.

[4] The Statement on page 2 of Claimant's Pre-Hearing Memorandum that Brooks Houghton "continued to work diligently on Life Partners' behalf up to the time Life Partners entered into the [Mammoth] Financing" (i.e. December 31, 2005) is simply not true.

Brooks Houghton's reliance on communications between Mr. Centofanti and Mr. Beste as authorizing an expansion of the scope of its engagement under the Letter Agreement is misplaced for several reasons:

- The Letter Agreement expressly provides that it "may not be amended or modified except in writing executed by Life Partners and the Advisor" (Claimant's Ex. 1, p. 4).

- Mr. Centofanti admitted that after the date of the Letter Agreement, he did not receive any written agreement signed by Life Partners authorizing Brooks Houghton to act as a financial advisor to obtain equity financing[5].

- Mr. Centofanti conceded in his testimony his understanding that any change in the scope of Brooks Houghton's services would have to be approved by Mr. Pardo. See also, Claimant's Ex. 15.

- Mr. Centofanti further admitted that he was told by Mr. Beste that any revised agreement would have to be handled through Mr. Peden. See also, Claimant's Ex. 36.

- In recognition of the foregoing Mr. Centofanti, in fact, sent the Revised Letter Agreement providing for the expansion of the scope of Brooks Houghton's engagement and changing it from "non-exclusive" to "exclusive" (See Respondent's Ex. 21 and Claimant's Ex. 21),[6] and declined to do any further work until it was signed.

Finally, Claimant's contention that Life Partners retained FTI, which worked on "parallel tracks" with Brooks Houghton and ultimately approached Sumitomo and Capsource is irrelevant. For the reasons testified to by Mr. Pardo, the bottom line is that Life Partners was unable to make a deal with either of these two companies - - whether through Brooks Houghton or FTI, was unable to obtain debt financing from anyone else and, in any event, Brooks Houghton has not asserted any claim based thereon.[7]

---

[5] That the Mammoth Transaction was an equity transaction and not a warehouse facility is undisputed by Claimant (Claimant's Pre-Hearing Memorandum, pp. 3, 5, 7-8).

[6] Respondent's Ex. 21 reflects the changes between the Letter Agreement and Revised Letter Agreement.

[7] Such a claim based upon unaccepted proposals would be foreclosed, in any case, by the provision in the Letter Agreement that "Life Partners has the complete and unabridged right to accept or reject any Financing arranged by the Advisor."

By reason of the foregoing, Life Partners respectfully requests that Brooks Houghton's claim be dismissed in its entirety and that Life Partners be awarded its costs of this proceeding.

Respectfully,

*Arthur D. Felsenfeld*

Arthur D. Felsenfeld

cc:   Kenneth L. Bressler, Esq.
      Daniel J. Brown, Esq.
      Jennifer Eltahan

NYC:157573.1                                5